**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MATTHEW R. GELBER, *et al.* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. AW-05-3094 |
| | * | |
| BOARD OF EDUCATION OF | * | |
| MONTGOMERY COUNTY, *et al.* | * | |
| | * | |
| Defendants | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OPINION**

Matthew R. Gelber (the "Child") and his parents, Rand and Nancy Gelber ("Parents"), (collectively "Plaintiffs") sued Jerry Weast, the Superintendent of Montgomery County Public Schools, and the Board of Education of Montgomery County ("Defendants") seeking reimbursement of the costs incurred by placing the Child in a private school after Defendants allegedly failed to provide the Child with a free appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 *et seq*. An administrative hearing was held on July 19, 2005 before Administrative Law Judge ("ALJ") Nancy E. Paige. In the administrative proceedings, the ALJ dismissed the Parents' request for a due process hearing on the grounds that the Parents failed to comply with federal and state statutory notice requirements. The ALJ did not reach the merits of Plaintiffs' claim. Currently pending before this Court is Plaintiffs' motion for summary judgment [11] and Defendants' cross motion for summary judgment [12]. The Court has reviewed the parties' pleadings and the oral arguments of counsel. For the reasons stated more fully below, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' motion for summary judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The facts of the case are taken verbatim from the decision of the ALJ. *Matthew Gelber v. Montgomery County Public Schools*, OAH No. MSDE–MONT–OT–05–27966 (August 17, 2005). On June 2, 2005, the Parents filed a request for a due process hearing under the IDEA. A hearing was held before the ALJ on July 6, 13, and 19, 2005. In her August 17, 2005 decision dismissing the Parents' request, the ALJ made the following findings of fact:

1. The Child is 15 years old. He has been attending [Stone Mountain School] since October 1, 2004, the beginning of his 9th grade.

2. The Child has been under the care of a psychiatrist since he was 4 years old. He was initially diagnosed with Attention Deficit Hyperactivity Disorder (ADHD). Diagnoses of Conduct Disorder and, most recently, Bi-Polar Disorder have been added. At the present time he is taking Risperdol, Zyprexa, Neurotin, and Concerta to address his psychiatric conditions.

3. In 1995, while in kindergarten, the Child was evaluated because of behavioral problems. The evaluation, by Arnold R. Bruhn, Ph.D., indicated cognitive functioning within the average range, with poorer performance on visual-motor and memory tasks. Observational data reflected significant distractibility, impulsivity and attentional difficulties. He was easily overstimulated and often provocative with peers.

4. An evaluation in 1998, in the 2nd grade, continued to reflect average cognitive abilities, with weaknesses in short-term memory. Further evaluation reflected reading disabilities and characteristics that affect attention, sustained effort, planning, organization, and efficiency of responding. The IEP team determined that the Child did not meet the criteria for an educational handicap, but provided accommodations under a "504 Plan." An evaluation performed before the Child entered 4th grade reflected reading and math scores in the average range, with weaknesses in comprehension of expository material. Written language scores were low average, with weakness in written expression.

5. The Child was coded "other health impaired" ("OHI") and "learning disabled" ("LD") in the fourth grade and has had an IEP since December 1999.

6. The Parents have continuously provided outside tutoring and outside therapy to support the Child.

7. In August 2003, the Child's psychiatrist recommended that the Child be placed in a "small, nurturing school program with therapeutic support. The program must have a structured behavior component as well as therapy for [the Child]…."

8. At the IEP meeting on September 8, 2003, at which the 2003-2004 IEP was adopted, the Parents asked about non-public programs. The team concluded that the Bridge Program at the Gaithersburg Middle School could meet the Child's needs and was the least restrictive

    environment ("LRE") for him.

9. The Bridge Program is a self-contained unit within both the middle and high schools. The IEP provided for 100% of the Child's time in special education classes and stated that his "other health impairment and learning disability negatively impact his involvement and progress in general ed[ucation] setting."

10. The Child's 2003-2004 IEP contains specific social/emotional goals, including the following:
    a. [The Child] will demonstrate ownership of behavior.
    b. The student will communicate in an acceptable manner in the classroom.
    c. [The] student will respect other people's property.
    d. [The] student will learn social skills appropriate for peer interaction.

11. In addition, the Child had goals in written expression, composition and math.

12. The IEP provided for a re-evaluation in 90 days to consider whether the Child's primary disability was emotional disability. In order to address this question, the team recommended consideration of a private psychological evaluation, classroom observation and a record review. The record does not reflect whether such a re-evaluation occurred.

13. At the end of the 8th grade, the Child's teacher reported some progress on all of his social/emotional goals, except those dealing with theft. However, he did not achieve any of his social/emotional goals by the end of the school year, and he continued to have serious behavioral problems, including inappropriate language, opposition to directions, and stealing.

14. The Child's grades for the 8th grade were all As and Bs, except for a C in math.

15. The Child passed all Maryland State assessments.

16. An IEP meeting was convened on Mach 22, 2004 to develop an IEP for the 2004-2005 school year. In addition to writing, reading and math goals, the IEP included the following social/emotional goals:
    a. [The Child] will demonstrate improved appropriate peer relationships.
    b. [The Child] will demonstrate improved self confidence and stress management skills.

17. The March 22, 2004 IEP provided for continued placement in the Bridge Program for the 9th grade, but at Gaithersburg High School, since the Child would complete Middle School at the end of the 8th grade.

18. By the end of the 8th grade, the Child had mainstreamed in United States History. Additional mainstreaming was considered, but his 9th grade IEP continued to provide for one mainstream class, with 87.5% of his time in special education.

19. The Parents did not request any services not reflected on the March 22, 2004 IEP and did not

      object to the placement.

20. In May 2004, the Child engaged in inappropriate sexual behavior with two young female relatives. The incident brought him into the juvenile justice system. He was not sanctioned by the system, but his Parents sent him to a wilderness camp. As a result, he did not participate in extended school year ("ESY") services that were part of his IEP.

21. At the end of the school year, some time in June, the Child's father attempted to contact the director of the Bridge Program, Thomas Christina. Mr. Christina was on vacation and the father advised the secretary that he wished to convene an emergency IEP meeting. He did not indicate why. The father also left messages requesting an emergency IEP meeting. The father did not explain the reasons for his request. MCPS declined to convene an emergency IEP meeting.

22. By approximately mid-August, the Parents had decided to send the Child to private school.

23. On September 24, 2004, counsel for the Parents wrote to George Moore of MCPS, confirming an earlier conversation, and requesting a new Central IEP meeting. Counsel further advised of the Parents' "intention to place [the Child] in a therapeutic residential program in the near future."

24. The Child started [Stone Mountain School ("SMS")] on or about October 3, 2004.

25. Mr. Moore responded on October 4, 2004, reiterating the IEP team recommendation that the Child continue in the Bridge Program, and stating that the recommendation was for two classes in the mainstream. He also requested any updated information to be considered before scheduling an IEP team meeting.

26. Counsel for the Parents did not respond to the October 4, 2004 letter until February 16, 2005, at which time he forwarded academic and behavioral information from SMS.

27. An IEP meeting was scheduled for March 9, 2005. At that time, discussion was tabled, pending the receipt of additional information and assessments.

28. On March 22, 2005, Debra Echtenkamp, the School Psychologist at MCPS, performed an assessment of the Child. Her report is dated April 13-20, 2005.

29. Ms. Echtenkamp's assessment reflected that the Child continued to be learning disabled, with skills ranging from average to well below average. Additionally, while not exhibiting a mood disorder or psychosis, the Child's behavior reflected "poor reality testing in the form of difficulty reading social situations and misperceptions of events and intentions." His personality development was immature and egocentric and he experienced elevated levels of anxiety and sadness. As a result of his ADHD, he had difficulty regulating attention, impulses, and activity, and he lacked insight and awareness of his disorder and how it affects his social and educational functioning.

30. On April 8, 2005, an Educational Assessment Report was completed by Nancy Rosenberg, based on her assessment on March 21, 2005. The Child's overall performance on the assessment was in the low average to average range. This is comparable to his performance on earlier assessments in his school career.

31. A speech/language assessment of the Child performed on March 24, 2005 did not reveal any speech/language impairments, but did reveal weakness in short term auditory memory skills.

32. On March 15, 2005, the Child scored below grade level on the TORC-3 test of reading comprehension. The Child's impulsivity and oppositional attitude impaired his performance on the test.

33. On April 25, 2005, the IEP team met to consider the recent assessment and to make any necessary revisions in the Child's IEP for the 2004-2005 school year. As a result of that meeting, the Child's placement was changed from the Bridge Program to the Foundation School, a private therapeutic day school, and "emotional disturbance" ("ED") was added to his identified disabilities. The Parents declined to move the Child from [Stone Mountain School] to the Foundation School.

## STANDARD OF REVIEW

The standard of review of motions for summary judgment in IDEA cases is somewhat different than the typical summary judgment standard. The Fourth Circuit has instructed that

> [i]n a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities.

*MM by DM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002); *see also Sanger v. Montgomery County Bd. of Educ.*, 916 F. Supp. 518, 520 (D. Md. 1996).

## ANALYSIS

Since the ALJ dismissed the Parents' request solely on statutory notice grounds, the only applicable statutes are the federal and state statutes pertaining to notice.

*Federal Notice Requirements under the IDEA*

> The cost of reimbursement [for a unilateral private school placement] may be reduced or denied--

   (I) if--
    (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
    (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

20 U.S.C. § 1412(a)(10)(c)(iii)(I).

*State Notice Requirements under the Maryland Education Article*

 (3) Unilateral Placement in a Nonpublic School by a Parent.
  (a) If a local school system has made FAPE available to a student with a disability and the parent chooses to place the student in a nonpublic school, the local school system is not required to pay for the student's education at the nonpublic school in accordance with 34 CFR § 300.403 and Education Article, § 8-413(i), Annotated Code of Maryland.
  (b) Before removing a student from a local school system, a parent shall notify the local school system of the parent's:
   (i) Decision to reject the local school system's proposed placement;
   (ii) Concerns leading to the decision to remove the student from the local school system; and
   (iii) Intentions to enroll the student in a nonpublic school at public expense.
  (c) The parent shall provide notice as described in § B(3)(b) of this regulation by:
   a. Informing the IEP team at the most recent meeting the parent attended before the removal of the student; or
   (ii) Providing the local school system with written notice at least 10 business days, including holidays that occur on business days, before the removal of the student.

COMAR 13A.05.01.16.3.

In their motion for summary judgment, Plaintiffs spend a great deal of time and pages arguing the standard of review this Court should apply in IDEA cases. That question, however, is settled law in the Fourth Circuit. *See Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). Buried beneath their standard of review arguments, Plaintiffs contend that the ALJ's

decision should be reversed because the ALJ failed to give dispositive weight to the School Board's refusal to convene an emergency IEP meeting. They do not, however, refute the fact that they did not inform the School Board at the March 22, 2004 IEP meeting of their intent to place the Child in private school. They also do not refute the fact that they did not provide the School Board with written notice of their intent to place the Child in private school within 10 business days prior to the removal. Plaintiffs simply argue that this Court should excuse their deficiency because the School Board should have convened the requested emergency IEP meeting in June. At oral argument, Plaintiff explained to the Court that had the School Board convene the emergency meeting, the Parents would have notified the School Board of their intent to remove the Child from public school.

There are only five ways Plaintiffs' failure to provide the requisite notice can be excused.

> Notwithstanding the notice requirement . . . the cost of reimbursement--
> (I)    shall not be reduced or denied for failure to provide such notice if--
>        (aa)   the school prevented the parent from providing such notice;
>        (bb)   the parents had not received notice, pursuant to section 615 [20 USCS § 1415], of the notice requirement in clause (iii)(I); or
>        (cc)   compliance with clause (iii)(I) would likely result in physical harm to the child; and
> (II)   may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if--
>        (aa)   the parent is illiterate or cannot write in English; or
>        (bb)   compliance with clause (iii)(I) would likely result in serious emotional harm to the child.

20 U.S.C. § 1412(a)(10)(c)(iv). Plaintiffs very candidly admitted to the Court that although both Parents are attorneys, neither parent knew about the statutory notice requirement. However, it is undisputed that prior to the Child's removal from public school, the Parents received a copy of the School Board's Procedural Safeguards Manual which outlined the procedures and requirements for obtaining reimbursement. The crux of Plaintiffs' argument is that the School Board *prevented* them

from providing the required notice, thus their failure to do so should be excused. In opposition, Defendants correctly point out that the School Board's decision not to convene the emergency meeting was fully considered and rejected by the ALJ. The Court sees no reason to second guess or reject the ALJ's consideration of the issue. This Court addressed a similar issue in *Baltimore City Bd. of School Commissioners, et al. v. Isobel Taylorch, et al.*, 395 F. Supp. 2d 246 (D. Md. 2005). In that case, the school board conceded that its failure to convene an IEP meeting upon the parents' request was a violation of the IDEA. However, Judge Motz denied tuition reimbursement to the parents because the parents did not comply with the statutory requirements for obtaining reimbursement. *Id.* at 249. Particularly, the IDEA requires that in order for a parent to receive reimbursement for placing their child in a private program, the a child must have previously been enrolled in a public program. *Id.* While not directly on point, the Court finds Judge Motz's reasoning persuasive. The School Board's refusal to convene an emergency IEP meeting does not alleviate the Parents of their duty to provide notice. Further, the nonoccurrence of the IEP meeting in July 2005 in no way precluded the Parents from providing timely written notice within 10 days of removing the Child from public school in October 2005.

There is nothing before this Court that can cure Plaintiffs' failure to provide the required notice. The unfortunate fact of the matter is that "parents who unilaterally change their child's placement . . . without the consent of state or local school officials, do so at their own financial risk." *Burlington Sch. Comm. V. Dept. of Educ.*, 471 U.S. 359, 373-74 (1985). This basic principle holds true for the Gelbers. Therefore, their motion for summary judgment must be denied. For the same reasons, the Court must grant Defendants' motion for summary judgment.

## **CONCLUSION**

For the reasons stated above, the Court will deny Plaintiffs' motion for summary judgment

and grant Defendants' motion for summary judgment. An Order consistent with this opinion will follow.

October 27, 2006                                                          /s/
　　　　Date                                                    Alexander Williams, Jr.
                                                               United States District Judge